HOOD, Judge.
This is a workmen’s compensation suit instituted by Nelson Romero against South Louisiana Contractors, Inc. Plaintiff claims compensation benefits based on total and permanent disability, with penalties and attorney’s fees. Judgment was rendered by the trial court in favor of plaintiff, awarding him maximum compensation benefits for a period not to exceed 400 weeks, subject to a credit for the payments which have been made, but' rejecting his demands for penalties and attorney’s fees. Both parties have appealed. •
The issues presented are: (1) Has plaintiff been totally disabled since December 12, 1967, as the result of a work-connected accident? and (2) Is plaintiff entitled to recover penalties and attorney’s fees?
On October 6, 1966, while plaintiff was working for defendant, the right side of his face was struck by the limb of a tree, as the tree was being pulled by a dragline. The injuries which he sustained in that accident included, a laceration of his right eyelid and lacerations and contusions on the right side of his face.
The defendant company at that time was engaged in the business of drilling oil wells, and plaintiff was employed by it as a general laborer or roustabout. He had been working for defendant for about three weeks when this accident occurred, and he had been assigned to a crew which was engaged in preparing drilling sites. His principal duties were to carry heavy boards to the proposed drilling sites and to nail the boards in place.
Defendant has paid all medical bills which have been incurred by plaintiff for the treatment of his injuries, and it also has paid compensation benefits to Romero at the rate of $35.00 per week from the date of ‘the accident"'until December 12, 1967. The payment of compensation benefits was discontinued on the last mentioned date, and this suit was instituted on February 9, 1968.
Plaintiff was taken to a hospital and was treated by Dr. Victor Feske, a general practitioner, immediately after the accident occurred. The treatment administered by that doctor included the suturing of the laceration on plaintiff’s eyelid. Romero remained in the hospital overnight, but he was released the next morning and referred to Dr. Philip Pupera, his family physician, for further treatment.
Dr. Pupera, a general practitioner, treated plaintiff from October 8, 1966, to March 14, 1967. Upon his recommendation, plaintiff also was treated by Dr. Larry Eugene Baker, an ophthalmologist, from October 8, 1966, until February 14, 1967, and by Dr. Charles Edward LeBlanc, an eye, ear, nose and throat specialist, from March 14 to August 8, 1967. Dr. Baker removed the sutures within a few days after he began caring for plaintiff. The treatment administered by Dr. LeBlanc included a surgical procedure known as a “recession,” which was performed on May 26, 1967. It involved changing the position of the medial rectus muscle of the right eye in an attempt to correct plaintiff’s double vision.
Plaintiff also was examined by Dr. Robert F. Azar, an ophthalmologist, and by Dr. Blaise Salatich, an orthopedic surgeon. X-rays taken of plaintiff’s head and neck were examined by Dr. Harry James Moresi, Jr., a radiologist. All of the above named treating and examining physicians testified at the trial or by deposition.
*579 Plaintiff is 45 years of age. For about ten years immediately prior to the time this accident occurred he had worked as a common laborer, and as a labor foreman, for the City of Lafayette, “shovelling and cutting grass.” For about three and one-half years prior to that employment he worked as a roustabout for another employer, performing the same type of duties as those which were being performed by him when he sustained the above described injury. The record shows, therefore, that he customarily performed common labor.
Romero had been very nearsighted most of his life, and he had worn glasses with heavy corrective lenses since he was 13 years of age. He, however, had never experienced double vision prior to the date of the accident.
Plaintiff returned to work for defendant at his regular employment about eight days after the accident occurred, and he continued to work at that employment, putting in 60 to 70 hours per week, until February 11, 1967. He testified that he returned to work because he needed the money, but that he experienced considerable difficulty in performing his duties. After he discontinued working for defendant, he was employed as a timekeeper in a college dormitory in Lafayette, where he is still employed.
Plaintiff stated that he has had pain in his neck and has suffered from headaches since the date of the accident, and that he began to experience double vision two or three days after he returned to work following that accident. He testified that his condition continued to get worse as he worked, and that eventually he had to discontinue his employment because Dr. Le-Blanc advised him to do so and because he couldn’t see well enough to perform his duties. He said that when he now turns his head “in a hurry” he loses sight in his right eye momentarily, and that he then has double vision when looking in any direction for another moment. He also stated that a sudden turn of his head causes his right eye to hurt and the left one to start “jumping,” so that he is unable to recognize objects which are relatively close to him. He also complains that he cannot judge distances now as well as he could prior to the accident, that his eyes are now very sensitive to sunlight, and that he loses his sight completely when he gets hot while straining or working in the sun. He contends that during the last three or four months his headaches have become worse and that he is unable to do any heavy manual labor.
The trial court concluded that plaintiff is still totally disabled, and he awarded him compensation benefits based on total and permanent disability. In reaching that conclusion, the trial judge stated:
“The Court bases its finding of disability particularly upon testimony of the ophthalmologists. Dr. Baker stated that the rectus muscle’s deficit which existed when he examined the patient could have resulted from the injury. Dr. LeBlanc was of the opinion that the double vision could have resulted from a trauma and damage to the rectus muscle. Dr. Robert Azar found that Nelson Romero experienced double vision when looking to the right and estimated a 10% impairment of vision, although he did not say this was caused by the accident.”
We think the testimony of the three above named ophthalmologists establishes that as a result of the accident plaintiff sustained an injury to the right lateral rectus muscle of the eye, resulting in a paralysis or weakening of that muscle. The weakened condition of that muscle made it difficult for plaintiff to turn his right eye outward, or to his right, and it allowed the uninjured antagonist medial rectus muscle to pull that eye inward, thus causing plaintiff to have double vision. This condition was substantially corrected by the surgical “recession” which was performed by Dr. LeBlanc on May 26. 1%7. By that procedure the medial rectus muscle was taken from its original position and was reattached to the eyeball at a point further to *580 the rear, thus weakening or reducing the pull of the muscle on the eye. The operation was successful to the extent that it gave plaintiff good binocular vision in all directions, except that he had double vision when he rolled his eyes to his extreme right. The lenses on plaintiff’s glasses were changed, so that his vision actually was better after the surgery than it had been before, except for the fact that he had double vision in this very narrow area.
The doctors described plaintiff’s diplopia, or double vision, as being a “small amount of diplopia” or as being “minimal.” Dr. LeBlanc, for instance, described it as follows :
“A. My test demonstrated that the central or primary position, he did have binocular vision, but when looking to the extreme right, that he did have some diplopia — a small amount of diplopia.”

“Q. Is this double vision in the extreme right field, as a matter of fact, noticeable to the patient ?
“A. I’d say it’s a minimal amount just in the right lateral gaze to the extreme right, so to speak. And that would be the only position.
“Q. Now, Doctor, as a matter of fact, this extremely minimal double vision which the patient has had since the operation, as far as functional disability is concerned, is almost negligible, is it not, sir?
“A. Yes.”
Dr. Azar pointed out that plaintiff’s peripheral vision has never been impaired in any way, and that after the above mentioned surgery was performed his normal vision was good in all fields, except that double vision occurred when he looked “far to the right.” Because of this double vision when plaintiff rolls his eyes to the extreme right, this doctor estimated that he had a ten percent loss of visual efficiency. With reference to this loss of efficiency, however, Dr. Azar testified:
“Very few people have cause to turn their eyes to the extreme on one side or the other. If you hear a noise or you are called and you want to' look to one side, the normal person moves his head and the eyes seldom move more than 30 degrees or 40 degrees from the straight ahead position.
“Within that range, he doesn’t see double at all, and he only sees double when he sees far to the right side and this in itself is not an incapacitating visual dysfunction or malfunction.”
Dr. Baker treated plaintiff for more than four months immediately after the accident occurred, and he testified that no complaints of diplopia, or double vision, were made to him at any time while plaintiff was under his care. He, of course, did not see plaintiff after the surgical recession was performed, so he was unable to testify as to his condition after that operation.
The ophthalmologists who treated or examined plaintiff also were of the opinion that the injury was not sufficient to disable plaintiff from performing the duties of his employment. Dr. LeBlanc, for instance, testified that he examined plaintiff about two weeks before the trial which began on March 25, 1968, and that his condition then was the same as it was five days after the surgical recession had been performed. With reference to his findings on the last mentioned dates, the doctor testified:
“Q. And it was your opinion, at that time, that Mr. Romero could go back to doing roustabout type work?
“A. I thought so. I think that he could have done it. I think so.”

“Q. Now, if, for example, he’s on a rig platform and he has to watch a— machinery with cables on the right side and watch other workers on the left side, necessarily on his right side he would *581 have his diplopia, wouldn’t he? He’d have his double vision, wouldn’t he?
“A. Yes, But, I don’t think it would bother him that much.
“Q. In other words, on the general labor market, you feel that this patient could function safely ?
“A. Yes.”
Dr. Azar, testifying as to the extent of plaintiff’s disability, stated:
“Q. Doctor, in your opinion, would the double vision which you found in this patient hinder him in any way in performing work as a common laborer or roustabout ?
“A. In my opinion, it would not.”

“Q. Doctor, so far as the double vision which you found, do you feel this would in any way hinder him from driving an automobile ?
“A. In my opinion, it would not.”

“Q. Doctor, in your professional opinion when you examined this patient on December 1, did you feel he was able to return to his former occupation of roustabout or common laborer ?
“A. Yes, that was and is my opinion.”
As we have already noted, Dr. Baker did not examine plaintiff after the surgery had been performed. He testified, however, that he discharged plaintiff as being able to return to work on October 31,1966, which was only a few weeks after the accident occurred. He reopened the case in view of plaintiff’s additional complaints, but after further treatment he again discharged him as being able to return to work on January 21, 1967. Plaintiff continued to complain, however, and on February 14, 1967, that being the last day on which Dr. Baker examined him, he reported “Doing well, hold off on discharge.” Although the last report of the doctor indicates that further treatment was necessary, that being consistent with the views expressed by the other eye specialists, his testimony shows that he nevertheless has not regarded plaintiff’s injuries as being disabling since October 31, 1966.
We agree with the trial judge in his conclusion that the double vision which plaintiff has experienced since October 6, 1966, was caused by the accident which occurred on that date. We feel, however, that the trial judge has erred, as a matter of law, in concluding that plaintiff is totally disabled because of the double vision which he has experienced since the payment of compensation benefits was discontinued.
We have considered the fact that plaintiff contends that he suffered other injuries as a result of the accident, in addition to the one which produced the double vision, and that all of these injuries, together with his diplopia, totally disable him from performing common labor, and particularly disable him from performing the duties of a roustabout. We have concluded, however, that the evidence fails to support that claim.
Plaintiff contends that he has suffered from headaches since the accident occurred, and we think the medical evidence supports his testimony to that effect. The evidence convinces us, however, that these headaches were caused largely by his diplopia and nearsightedness, and that he obtained substantial relief as a result of the surgical recession which was performed and by the correction of his lenses. The statements of Dr. Baker and of Dr. Pu-pera indicate that plaintiff made no complaints of headaches until January or February, 1967. Dr. LeBlanc testified that before he performed surgery on plaintiff’s eye, the latter obtained substantial relief from headaches when a patch was placed over his right eye, thus showing that the headaches were caused by eye strain which was later corrected. Dr. Azar testified that no complaints were made to him of symptoms other than that his eyes were *582 weak when he looked to the right. We think the headaches which he has suffered since the payment of compensation benefits was discontinued have not been disabling.
The medical evidence does not support plaintiff’s complaints that he loses the sight in his right eye momentarily when he suddenly turns his head, and that his left eye jumps and he has double vision for another moment while looking straight ahead. But, assuming that such a condition does exist, we feel that it does not disable him from performing the duties of a common laborer or a roustabout.
Dr. LeBlanc conceded that it was possible, from a physiological standpoint, for plaintiff to lose his sight completely when he gets overly hot while straining or working, but neither he nor any of the other medical experts expressed the opinion that such a condition existed or that, if it did exist, it could be connected in any way with the accident.
Finally, plaintiff complains of pain in his neck. Dr. Salatich, who examined plaintiff once about 17 months after the accident occurred, felt that he had sustained a moderate to marked neck injury, with a stretched type cervical nerve root injury, as a result of the accident. X-rays made on March 5, 1968, were examined by Dr. Salatich, and from these x-rays and his clinical examination he concluded that plaintiff had a narrowing of intervertebral discs between the fifth and sixth cervical vertebrae and between the sixth and seventh cervical bodies, together with a lipping or spurring of those bodies. In his opinion, these injuries to plaintiff’s neck caused him to suffer pain and dysfunction of the eye, ear, throat and neck. He is firmly of the opinion that plaintiff is disabled from performing manual labor.
Dr. Moresi examined the x-rays which had been made on March 5, 1968, and on which Dr. Salatich had used as the basis for some of his conclusions, and he also compared them with x-rays which were made on March 6, 1966, that being the day on which the accident occurred. He testified that these films showed some narrowing of the disc spaces between C-S and C-6, and between C-6 and C-7, and some osteoarthritic changes in those areas, but they also showed that no change had taken place in plaintiff’s cervical region since the date of the accident. He found no change in alignment, no change in the narrowing of the discs, and no change in spurring. He concluded that any abnormal condition in plaintiff’s cervical span which was shown in either x-ray had existed for at least two or three years before the accident occurred.
Dr. Feske was unable to find any signs of injury to the neck when he first examined plaintiff. Dr. Pupera testified that plaintiff did not complain of pain in his neck until some time in February, 1967, and Dr. LeBlanc and Dr. Azar testified that he made no complaints of neck pain to them. This indicates that the neck pain which plaintiff suffered during that period was not severe.
As we have already noted, plaintiff returned to work eight days after the accident occurred, and he has been working almost continually since that time. For four months immediately following the accident he performed heavy manual labor, working 60 to 70 hours per week, with no apparent difficulty. Also, he concedes that in November, 1967, he applied for employment as a guard on an armored car, and in January, 1968, he applied for work as a truck driver. It is inconsistent for him to seek either of those types of employment and at the same time contend that he is totally disabled from performing common labor because of double vision or other deficiency in his eyesight.
Our conclusion is that the double vision which plaintiff experiences is not sufficient to render him totally disabled within, the meaning of the workmen’s compensation act, and tha,t the evidence fails to show that he has any other disability as the result *583 of a work-connected accident. The judgment appealed from, therefore, must be reversed.
Since plaintiff is not entitled to recover compensation benefits after December 12, 1967, the defendant cannot be said to have been arbitrary or unreasonable in refusing to pay such benefits after that date. Plaintiff thus is not entitled to recover penalties and attorney’s fees.
For the reasons herein set out, the judgment appealed from is reversed, and judgment is rendered here in favor of defendant, rejecting plaintiff’s demands and dismissing this suit at plaintiff’s costs. The costs of this appeal are assessed to plaintiff-appellant.
Reversed.
On Application for Rehearing.
En Banc. Rehearing denied.